**Not for Publication**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETER KUHN, | Civil Action No. 24-1123 (ES) (MAH) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| JOVAN WILLFORD, | |
| **Defendant.** | |

**SALAS, DISTRICT JUDGE**

Before the Court is defendant Jovan Willford's ("Defendant") motion to dismiss (D.E. No. 40 ("Motion" or "Mot."); D.E. No. 40-1 ("Mov. Br.")) plaintiff Peter Kuhn's ("Plaintiff") amended complaint (D.E. No. 38 ("Amended Complaint" or "Am. Compl.")).  Plaintiff filed an opposition (D.E. No. 43 ("Opp. Br.")), and Defendant filed a reply (D.E. No. 44 ("Reply Br.")).  Having considered the parties' submissions, the Court decides Defendant's Motion without oral argument. *See* Fed. R. Civ. P. 78(b); *see also* L. Civ. R. 78.1(b).  For the following reasons, Defendant's Motion is **GRANTED**.

## I.   BACKGROUND

### A.   Factual Background[1]

Plaintiff is an individual who currently resides in Alabama and who has over twenty-five years of experience in the healthcare technology industry.  (Am. Compl. ¶¶ 1, 8).  In December 2020, Plaintiff became the Chief Sales and Growth Officer of Healthgrades.  (*Id.* ¶ 19).  Defendant

---

[1]   The factual background is taken from the allegations in the Amended Complaint.  For purposes of the instant Motion, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiff.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

is an individual who currently resides in New Jersey and was hired as the Chief Executive Officer ("CEO") of Healthgrades in March 2021.  (*Id.* ¶¶ 9 & 20).  In June 2021, Healthgrades sold its Marketplace division in an asset sale, and, following this divestiture, Mercury Healthcare ("Mercury Healthcare" or the "Company") was created in July 2021.  (*Id.* ¶¶ 21–22).  Shortly thereafter, on or about July 13, 2021, Plaintiff was promoted to Chief Revenue Officer ("CRO") of the Company.  (*Id.* ¶ 26).  "In connection with the promotion, Plaintiff received stock options with a 'total target value of $300,000 net of exercise price, upon a 'Sale of the Company.'"  (*Id.* ¶ 27).

As CEO, Defendant hired a non-party company called A&M Consulting to conduct a financial review of the remaining business at Mercury Healthcare,[2] and "[u]pon [Plaintiff's] information and belief, A&M Consulting immediately discovered that the leftover business at Mercury was losing $30 million annually (a surprise to the Board) and was suffering with major product and customer satisfaction issues on two primary product lines."  (*Id.* ¶¶ 23–24).  Based on A&M Consulting's recommendations, from August 2021 to December 2021, Plaintiff initiated a cost-cutting plan to reduce the number of sales and account management staff members.  (*Id.* ¶ 33).

From mid-November 2021 through December 2021, Defendant and "other members of the Mercury Healthcare[ ] executive team" briefly "disappeared" from the Company after presenting a grim financial plan to the Board of Directors; during this time, "there was a rumor of a Board-initiated fire sale spreading through the management team[.]"  (*Id.* ¶ 35–37).  Defendant "suddenly reappear[ed]" in December 2021 and held a meeting with upper management and the executive team members "concerning a sale of the Company."  (*Id.* ¶ 38).  Defendant subsequently presented

---

[2]     The Amended Complaint does not specify when Defendant allegedly hired A&M Consulting, nor when this financial review occurred.  (*See generally* Am. Compl.).

a five-year plan that included "killing off" two of the Company's major product lines. (*Id.* ¶ 39). Plaintiff had concerns about this plan, and on December 10, 2021, he contacted Defendant by phone and "asked Defendant if the Company was committed to a turnaround or if it was instead being positioned for a sale." (*Id.* ¶ 40–43). At the time of this phone call, Defendant was in New Jersey. (*Id.* ¶ 42). "Defendant assured Plaintiff that the Company was not going to be sold and was focused on executing its [five]-year operating plan[.]" (*Id.* ¶ 46). "Contrary to his direct statement, at this time—December 10, 2021—Defendant was in communication[ ] with WebMD about selling the Company" and "had begun negotiations to sell Mercury Healthcare to WebMD[,]" with meetings regarding that sale beginning in "early December of 2021." (*Id.* ¶ 49–50).

From December 2021 through March 2022, Plaintiff had a series of conversations with Defendant regarding the then-current direction of the Company and its effect on the Company's culture. (*Id.* ¶ 53). On January 12, 2022, Plaintiff and Defendant spoke by telephone. (*Id.* ¶ 54). On that call, Plaintiff "again asked Defendant if he was positioning the Company for a sale." (*Id.* ¶ 55). Plaintiff "had heard speculation about such a sale" and felt that "the Company's operational decision" suggested that a sale was possible. (*Id.*). In response, Defendant denied that the Company was engaged in any negotiations. (*Id.* ¶ 56).

According to Plaintiff, in response to his questions, Defendant created a hostile work environment for him during this time by instructing him to make "cold calls" to potential customers and to complete other tasks more frequently reserved for lower-level employees, in an effort to force him to resign. (*Id.* ¶¶ 57–60). Plaintiff was also "uninvited" to the "Q4 2021 Board of Directors meeting," and, at some point after that meeting, he again approached Defendant and

asked him if he was planning to sell the Company.  (*Id.* ¶¶ 61–66).  Defendant again told Plaintiff that the Company was not going to be sold and was committed to a turnaround.  (*Id.* ¶ 67).

Defendant continued negotiations to sell the Company to WebMD.  (*Id.* ¶ 68).  On February 8, 2022, WebMD "issued a formal indication of interest[,]" following which Defendant met with the Company's senior leadership to discuss the sale.  (*Id.* ¶ 69–70).  On February 23, 2022, Defendant sent the Company's Board of Directors a memorandum outlining his position that the Company should sell to WebMD.  (*Id.* ¶ 71).[3]  On March 1, 2022, Plaintiff and Defendant spoke again over the phone.  (*Id.* ¶ 72).  Plaintiff again asked if the Company was being positioned for a sale. (*Id.*).  Defendant denied that it was, and "warned Plaintiff not to raise [the] subject with him again."  (*Id.* ¶ 73).  At "approximately the same time," the Company created a term sheet with bonus payouts for executives.  (*Id.* ¶ 74).  According to "one of" the term sheets, Plaintiff "was to receive a bonus payout of $496,499.00 following the closing of the contemplated sale."  (*Id.* ¶ 75).[4]

On March 9, 2022, Plaintiff submitted his resignation notice "[a]s a result of Defendant's hostile treatment of [him], and in response to Defendant's stated intent to pursue a fatally flawed turnaround plan[.]"  (*Id.* ¶ 76).  A week after Plaintiff submitted his resignation, the Company held a leadership meeting to discuss the potential sale to WebMD.  (*Id.* ¶ 77).  "Upon [Plaintiff's] information and belief," attendees of the meeting "were told not to discuss their participation and attendance with Plaintiff."  (*Id.* ¶ 78).

---

[3]    It is unclear from the allegations in the Complaint if Plaintiff attended the February 22, 2022 meeting or received the February 23, 2022 memorandum, although Plaintiff (i) alleges that he spoke to Defendant by phone to again ask if the Company was being positioned for a sale shortly after the February 22, 2022 meeting; and (ii) notes specifically that he was "uninvited to the March 2022 Board of Directors meeting," which was "very unusual."  (*See* Am. Compl. ¶¶ 68–72).  Neither party filed the February 23, 2022 memorandum as an exhibit in this matter.

[4]    Although Plaintiff refers to "one of" the term sheets, it is unclear how many term sheets existed or if other term sheets reflected different information.

Plaintiff's last day at the Company was April 1, 2022.  (*Id.* ¶ 79).  Two months later, in June 2022, WebMD announced that it had acquired the Company, though it did not publicly disclose the terms of the deal at the time.  (*Id.* ¶ 80).  However, Plaintiff received a notice pursuant to Internal Revenue Code Section 208G that showed multi-million-dollar deal bonus payments made to Defendant and other executive members of the Company.  (*Id.* ¶ 81).

Plaintiff alleges that Defendant "intentionally misrepresented and suppressed" certain information from him that caused him to resign from his position as CRO of the Company.  (*See generally* Am. Compl.).  Specifically, Plaintiff alleges (i) that Defendant "suppressed" from him the fact that in December 2021 the Company had begun conversations to sell the Company to WebMD; (ii) that, when asked, Defendant told Plaintiff the Company was not going to be sold and instead was committed to a five-year turnaround plan; (iii) that Defendant's suppression of information, along with the hostile work environment[5] he created for Plaintiff, ultimately induced Plaintiff to resign from the Company, effective April 1, 2022; and (iv) that Plaintiff lost out on a deal bonus he would have otherwise been entitled to pursuant to his employment contract as a result of Defendant's actions.  (*See id.*).  According to Plaintiff, Defendant intended to force him to resign "so that Defendant could avoid paying Plaintiff a deal bonus payout from the sale of the Company to WebMD and instead, keep that money for himself."  (*Id.* ¶ 89).

---

[5]    Although Plaintiff repeatedly uses the phrase "hostile work environment" to describe the treatment he experienced at the Company, (*see* Am. Compl. ¶¶ 7, 64, 87, 90, 100), he does not appear to bring a claim regarding "hostile work environment" under any applicable federal or state law.  To the extent Plaintiff intended to bring such a claim, it is again **DISMISSED** for failure to state a claim.  *See Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 276–77 (3d Cir. 2001) ("To make out a prima facie case for a religiously hostile work environment under Title VII, a plaintiff must demonstrate five elements: '(1) the employee[ ] suffered intentional discrimination because of [a protected characteristic]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [religion] in that position; and (5) the existence of respondeat superior liability." (quoting *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293 (3d Cir.1999)); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 114 (3d Cir.1999) (articulating the elements to make out a claim for hostile work environment under the New Jersey Law Against Discrimination).

### B.      Procedural History

On February 27, 2024, Plaintiff initiated this action by filing a complaint against Defendant, asserting one cause of action titled "Fraudulent Suppression/Deceit."  (*See generally* D.E. No. 1 "Complaint" or "Compl.").[6]  On June 11, 2024, Defendant filed a motion to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See generally* D.E. No. 14).  On June 30, 2025, the Undersigned issued an opinion and accompanying order granting Defendant's Motion to Dismiss, without prejudice.  (D.E. No. 36 ("Opinion" or "Op."); D.E. No. 37 ("Order")).  On July 30, 2025, Plaintiff filed the Amended Complaint.  (*See generally* Am. Compl.).  On August 27, 2025, Defendant filed the instant Motion.  (*See generally* Mot.; Mov. Br.).  The Motion is fully briefed.  (Opp. Br.; Reply Br.).

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  However, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."  *Id*. at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*,

---

[6]      The Complaint did not identify which state or statute/law governed this cause of action.

629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While the Court generally "may not consider matters extraneous to the pleadings" when deciding a Rule 12(b)(6) motion, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), an exception to this general rule provides that the Court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that, pursuant to Rule 12(b)(6), the Court "may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case'" (alteration in original) (first citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); and then quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004))).  Thus, "a court may consider 'an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Fuller v. Rozlin Fin. Grp., Inc.*, No. 19-20608, 2020 WL 5036215, at *2 (D.N.J. Aug. 26, 2020) (quoting *Clemons v. Midland Credit Mgmt., Inc.*, No. 18-16883, 2019 WL 3336421, at *2 (D.N.J. July 25, 2019)).[7]

---

[7]     Plaintiff attached no exhibits to his Amended Complaint.  (*See generally* Amended Complaint).  Defendant attached four exhibits to his Motion to Dismiss: the offer letters to Peter Kuhn, Nikolas Green, Christopher Hackney, and Manish Goel.  (*See* D.E. No. 40-2 ("Exhibit A," "Exhibit B", "Exhibit C," and Exhibit D," respectively)).  The Court considers Exhibits A, B, C, and D as matters incorporated by reference to the Amended Complaint.  *Buck*, 452 F.3d at 260; (*see* Am. Compl. ¶¶ 32 (referring to the "grants of stock options" Kuhn, Green, Hackney, and Goel received by way of their offer letters)).

Plaintiff attached the same documents to his Opposition Brief and labeled them "Exhibit 1," "Exhibit 2," "Exhibit 3," and "Exhibit 4."  (*See* D.E. No. 43-1 at 2–12 (ECF Pagination)).  Plaintiff additionally attached to his Opposition the following documents: (i) an "Executive Memo" dated October 2021 ("Exhibit 5"); (ii) an index of Project Alloy meetings ("Exhibit 6"); (iii) a term sheet ("Exhibit 7"); (iv) text communications between Plaintiff and Defendant ("Exhibit 8"); and (v) an email exchange between Plaintiff and Vestar ("Exhibit 9").  (*See* D.E. No. 43-1 at 13–39 (ECF Pagination)).

### B.      Rule 9(b) Heightened Pleading Standard

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement concerning allegations of fraud.  *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 435 (D.N.J. 2012).  Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "[T]he law does not require specificity just for specificity's sake"; rather, "[t]he level of particularity required is sufficient details to put [d]efendants on notice of the 'precise misconduct with which they are charged.'" *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting *Franulovic v. Coca Cola Co.*, No. 07-0539, 2007 WL 3166953, at *11 (D.N.J. Oct. 25, 2007)).  In other words, to satisfy Rule 9(b)'s specificity requirement, "the pleadings must state what the misrepresentation was, . . . when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss."  *Id.* (quoting *Zebersky v. Bed Bath & Beyond, Inc.*, No. 06-1735, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006)).  The Third Circuit has advised that, "at a minimum," a plaintiff must support allegations of fraud "with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1422); *see also United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016).

---

The Court does not consider Exhibits 5, 6, or 9, as none are "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [or] items appearing in the record of the case." *Buck*, 452 F.3d 256, 260 (3d Cir. 2006); *see also Garcia v. Hanwha Solarone USA, Inc.*, No. 12-6666, 2013 WL 3043479, at *2 n.2 (D.N.J. June 17, 2013) ("The Court may not . . . permit a party to amend its pleadings by attaching exhibits to its opposition brief.").  The Court does consider Exhibits 7 and 8 as matters incorporated by reference to the Amended Complaint, although the Court notes that Exhibit 7 is nearly impossible to read and the Court cannot glean much information from it.

8

III.    DISCUSSION

A.        Choice of Law

As an initial matter, the parties disagree regarding which state law applies to the claims at issue. (*Compare* Mov. Br. at 13–14 (citing *Liberty Nat'l Life Ins. Co. v. Parker*, 703 So.2d 307, 308 (Ala. 1997)), *with* Opp. Br. at 8–9).[8]    Each of Plaintiff's claims—common law fraud, fraudulent misrepresentation, fraudulent concealment, and fraudulent omission—rely on state law. (*See generally* Am. Compl.; Op.).    Defendant argues that a conflict of law exists between the potentially-applicable state laws (New Jersey and Alabama) with respect to the statute of limitations for Plaintiff's claims: while New Jersey has a six-year statute of limitations for fraud claims, Alabama has a two-year statute of limitations for the same. (*Compare* N.J.S.A. 2A:14-1, *with* Ala. Code 1975, § 6–2–38(*l*)).    Defendant argues that this Court should thus conduct a choice-of-law analysis and hold that Alabama law applies, because "it is likely where [Plaintiff] received and allegedly relied upon the representations; where he suffered the alleged harm; and where he was domiciled and employed." (Mov. Br. at 13–14).    If this Court agrees with Defendant and applies Alabama law, Defendant further contends that Plaintiff's claims are barred by that state's statute of limitations. (*Id*.).

On the other hand, Plaintiff argues that New Jersey law should apply, because he "believes the fraudulent statements were made when [Defendant] was in New Jersey." (Opp. Br. at 8). Plaintiff additionally appears to argue that no true conflict exists, such that this Court need not conduct a choice-of-law analysis at all, because his claims would not be barred by the statute of limitations for fraud under either Alabama or New Jersey law. (Opp. Br. at 9–10).

_____

[8]    This Court previously held that, because "Plaintiff did not address or respond to any of Defendant's arguments regarding the application of Alabama law" to his Complaint, Plaintiff had "waived any arguments he may have had under Alabama law or regarding the application of Alabama law to his claim." (*See* Op. at 10). The Court, however, did not reach the choice-of-law issue because Plaintiff's Complaint failed to meet Rule 9(b)'s heighted pleading requirements for a fraud claim. (Op. at 8–9).

When sitting in diversity—as this Court does now—a federal court must apply the choice of law rules of its forum state. *See Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011). "New Jersey has adopted the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Id*. (citing *P.V. v. Camp Jaycee,* 197 N.J. 132, 142–43 (2008)). First, a court must "examine the substance of the potentially applicable laws in order to determine if an actual conflict exists." *Id*. (citing *Camp Jaycee,* 197 N.J. at 143–44). "Where there is no actual conflict, the analysis ends and the court applies the law of the forum state." *Id*. (citing *In re Ford Motor Co.,* 110 F.3d 954, 965 (3d Cir. 1997)).

If the court finds that a conflict exists, however, the court must determine which jurisdiction has the "most significant relationship" to the claim by weighing the factors set forth in the Restatement section that corresponds to Plaintiff's cause of action. *See, e.g.*, *Nafar v. Hollywood Tanning Sys.*, 339 F. App'x 216, 220 (3d Cir. 2009) (citing *Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 463 (D.N.J. 2009)).[9] "Restatement § 148 applies specifically to fraud claims and identifies factors that courts should consider when making choice-of-law determinations[,]" including "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations," and "(c) the place where the defendant made the representations." *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013) (citing Restatement § 148(2)).

---

[9]  New Jersey courts have held that where the time limits in the statutes of limitation of two states differ, a true conflict exists, and the court must conduct a "most significant relationship" analysis. *See e.g.*, *Paul v. Prudential Ins. Co. of Am.*, No. 08–6197, 2009 WL 2959801, at *6 (D.N.J. Sept. 15, 2009) (finding conflict existed when "three states apply different statutes of limitations to their consumer fraud statutes."). Where the application of either statute of limitations, however, would yield the same result, no conflict exists, and the court need not proceed to the "most significant relationship analysis." *See, e.g.*, *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 304 (D.N.J. 2009).

Based on the present record, it would be premature for this Court to determine a choice of law for Plaintiff's fraud-based claims.[10] The Court "does not have sufficient facts to thoroughly analyze the various considerations required to adequately address a choice-of-law determination[,]" because Plaintiff has failed to allege his **own** location for any of the four telephone calls at issue or Defendant's location for any of those calls—except for the one on December 10, 2021. (*See* Am. Compl. ¶¶ 41–47, 54–56 & 72–73); *see also Prudential Ins. Co. of Am.*, 2013 WL 1431680, at *5; *Arcand*, 673 F. Supp. 2d at 295–96 (holding that the court could not undertake a choice-of-law analysis based on the record before it, but recognizing that it may be appropriate to determine choice of law on a motion to dismiss in other cases); *Harper v. LG Electronics USA, Inc.*, 595 F. Supp. 2d 486, 490 (D.N.J. 2009) ("The Court is unable to make the fact-intensive choice-of-law determination on the record before it. As the New Jersey Supreme Court has noted, [choice-of-law] analysis must be undertaken on an issue-by-issue basis."). Accordingly, the Court cannot determine where Plaintiff acted in reliance upon Defendant's representations, where Plaintiff received the representations, or where Defendant made all but the December 10, 2021 representation. Thus, "[i]n order to appropriately weigh each state's contacts . . . , this Court will benefit from acquiring further details regarding—for instance—where the alleged misrepresentations were made, where the alleged misrepresentations were relied on, Defendants' actions outside New Jersey, Plaintiffs' actions outside [Alabama], and locations of meetings and/or transactions among the parties." *Prudential Ins. Co. of Am.*, 2013 WL 1431680, at *5. Indeed, this Court identified the sparse record in its previous ruling on this matter, holding that "Plaintiff's Complaint fail[ed] to allege with sufficient particularity facts relating to the 'when'

---

[10]    "Courts generally make a choice of law determination on an issue-by-issue basis. Because this Court is deferring a choice of law decision to a later stage, a comprehensive analysis for each issue is not warranted." *See Prudential Ins. Co. of Am.* 2013 WL 1431680, at *5 n.4 (citation modified).

11

and 'where' of the allegedly fraudulent statements.  For example," this Court held, "Plaintiff does not allege specifically . . . where these interactions with Defendant took place—whether they occurred in person, virtually, or otherwise, and whether they occurred in New Jersey, Alabama, or elsewhere." (*See* Op. at 9).  Although Plaintiff now specifies that each of his conversations with Defendant took place over the phone, many of the same issues largely persist in the Amended Complaint.  (*See* Am. Compl. ¶¶ 41–47, 54–56, 72–73).[11]

Accordingly, this Court will apply New Jersey law to Plaintiff's claims.  *See Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (determining that a choice-of-law analysis was premature, and thus holding that "[s]ince Plaintiffs have made their allegations under New Jersey law, the Court will apply New Jersey law for the purpose of examining Plaintiffs' claim under the Rule 12(b)(6) standard"); *Mercedes-Benz USA, LLC*, 2010 WL 3283544, at *3 ("Where it is unclear what law to apply, courts should apply the law of the forum state to resolve motions to dismiss." (citing *Berry*, 2009 WL 233508, at *4)).[12]

---

[11]   To be sure, a choice-of-law determination is not *per se* premature at the pleading stage.  *See, e.g.*, *Bedi v. BMW of N. Am., LLC*, No. 15-1898, 2016 WL 324950, at *3 (D.N.J. Jan. 27, 2016).  Where the parties dispute the facts relevant to a choice-of-law analysis, however, a court may properly delay such an analysis.  *See, e.g.*, *Prudential Ins. Co. of Am.*, 2013 WL 1431680, at *5; *Berry v. Mega Brands Inc.*, No. 08–1750, 2009 WL 233508, at *4 (D.N.J. Jan. 30, 2009); *Mercedes-Benz USA, LLC v. ATX Grp., Inc.*, No. 08-3529, 2010 WL 3283544, at *3 (D.N.J. Aug. 18, 2010).

[12]   Even if the Court **did** have sufficient information to conduct a choice-of-law analysis, it is not convinced that any such analysis is necessary.  Although Alabama generally allows only two years for filing a fraud action and New Jersey allows six for the same, "[t]he two-year period [in Alabama] does not start to run until the plaintiff has actual knowledge of facts that would have put a reasonable person on notice of the fraud."  *See Liberty Nat. Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997) (first citing Ala. Code 1975, § 6–2–38(*l*); then citing Ala. Code 1975, § 6–2–3) (citation modified).  Plaintiff alleges that he discovered the fraud at the end of June of 2022, when "WebMD announced [to the public] it had acquired Mercury Healthcare."  (Am. Compl. ¶ 80).  Plaintiff filed this action on February 27, 2024, less than two years following his alleged discovery of Defendant's fraud.  (*See generally* D.E. No. 1).  Although Defendant argues that Plaintiff was on "inquiry notice" and should have reasonably discovered the fraud far earlier than he claims, "the Alabama Supreme Court has warned against hastily depriving plaintiffs of the opportunity for juries to determine the plaintiffs' reasonableness in detecting fraudulent activity[,]" and has noted that "this caution is especially acute at the motion to dismiss stage."  *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1249–50 (N.D. Ala. 2019); *see also Travis v. Ziter*, 681 So. 2d 1348, 1351 (Ala. 1996) ("[D]ismissal based on the statute of limitations is proper only if, from the face of the complaint, it is apparent that the tolling provisions do not apply.").  Here, though Plaintiff was privy to facts that would provoke an inquiry, following up on those facts with Defendant did not lead to the discovery of the fraud.  In other words, it is not apparent from the

**B.**         **Common Law Fraud and Fraudulent Misrepresentation**

The Court first considers Plaintiff's claims for common law fraud and fraudulent misrepresentation.  "The standard for establishing a claim of common law fraud, fraudulent misrepresentation, and fraudulent inducement under New Jersey law is the same"—a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Kare Distrib., Inc. v. Jam Labels & Cards LLC*, No. 09-0969, 2009 WL 3297555, at *4 (D.N.J. Oct. 9, 2009) (quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253 (N.J. 2005)); *see also Rainforest Distrib. Corp. v. Vybes L.A. LLC*, No. 20-0634, 2021 WL 3879099, at *9 (D.N.J. Aug. 31, 2021) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).  "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular N. Am.*, 876 A.2d at 261.  "An alleged misrepresentation must be premised upon an assertion that is not in accord with the facts." *Read v. Profeta*, 397 F. Supp. 3d 597, 635 (D.N.J. 2019) (citing Restatement (Second) of Contracts § 159 cmt. a, c (1981)).  "However, the assertion 'must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation.  Such facts include past events as well as present circumstances but do not include future events.'" *Id.* "Indeed, in order to constitute a fact, a statement's content must be susceptible of 'exact knowledge' at the time it is made." *Id.* (quoting *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998) *aff'd*, 172 F.3d 859 (3d Cir. 1998)).

Defendant argues that this Court should dismiss Plaintiff's claims for common law fraud

---

face of the Second Amended Complaint that the tolling provisions do not apply—and so no true conflict exists.  *See Dickinson v. Land Developers Constr. Co.*, 882 So. 2d 291, 298 (Ala. 2003).  New Jersey law would therefore apply under this standard as well.

and fraudulent misrepresentation because (i) "failure to disclose preliminary negotiations about a possible future sale is not a material misrepresentation of a presently existing fact"; (ii) "Plaintiff fails to allege that Defendant made any false statements with the intent to deceive"; and (iii) Plaintiff "fails to allege that he reasonably relied on any misstatements." (*See* Mov. Br. at 14–21). The Court addresses each argument in turn.

   ***Material Misrepresentation of a Presently Existing Fact***.  Defendant first argues that Plaintiff's claims for common law fraud and fraudulent misrepresentation fail because (i) they remain predicated on alleged misrepresentations about future, contingent events; and (ii) because any misrepresentations were immaterial.  (Mov. Br. at 15).

   Previously, this Court held that Plaintiff's "Complaint [did] not sufficiently allege how Defendant's failure to tell Plaintiff about an alleged potential future event [the sale of the Company] constitute[d] an actionable misrepresentation under New Jersey law." (Op. at 12 (citing *Read*, 397 F. Supp. 3d at 635 ("Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong."))).  Based on this standard, the Court again holds that any allegation that Defendant "assured Plaintiff that the Company was not going to be sold" or was instead "focused on executing its 5-year operating plan" does not constitute an actionable misrepresentation.  (*See, e.g.*, Am. Compl. ¶ 46).  Remaining, then, is Plaintiff's new allegation that Defendant materially misrepresented to Plaintiff that "there [were] no discussions concerning any sale of the Company" ***at the points in time*** when Plaintiff confronted Defendant about the possibility of a future sale.  (*See id.* ¶ 47, 56–57, 68).  As best this Court can discern, Plaintiff alleges two such instances: ***first***, on December 10, 2021, Defendant told Plaintiff "that, at that point in time, there [were] no discussions concerning any sale of the

14

Company." (Am. Compl. ¶¶ 41–47). According to the Amended Complaint, this statement was false because "Defendant was in communications with WebMD about selling the Company" and "the Company had begun negotiations to sell Mercury Healthcare to WebMD and meetings regarding that sale began taking place in early December of 2021." (Am. Compl. ¶¶ 48–50). *Second*, on January 12, 2022, Defendant "denied that the "Company was engaged in any negotiations concerning the sale of the Company." (*Id*. ¶ 54). Plaintiff alleges this statement was false because meetings regarding the sale "continued through early 2022" and Defendant was, at the time of this conversation, "engaged in internal discussions to sell the Company." (*Id*. ¶ 50, 57).

Defendant contends that Plaintiff's "amendments . . . do not cure the defect" with regard to these alleged misrepresentations "because courts have consistently held that nondisclosure of early-stage or preliminary negotiations do not amount to [ ] material misrepresentations." (Mov. Br. at 16 (citing *Mill Bridge V, Inc. v. Benton*, 496, F. App'x 170, 174 (3d Cir. 2012) (affirming dismissal of plaintiffs' complaint where merger talks were "in their infancy . . . before any material terms [were] negotiated.")))*.* Moreover, because Plaintiff "alleges no facts to establish that he ever had any entitlement to a deal bonus in the event that the Company was sold" or that "anyone from the Company ever promised him a deal bonus[,]" Defendant argues that the claim is layered in contingency, rendering it "speculative, contingent upon future events and legally insufficient." (*Id*. at 18–19).

In opposition, Plaintiff argues that each time he asked Defendant "if the Company was engaged in discussions [to sell the Company] . . . Defendant lied and said no." (Opp. Br. at 11 (citing Am. Compl. ¶¶ 41, 54–55, 66, 72)). Because Plaintiff alleges that "Defendant lied about what was happening *at the time* of Plaintiff's question[,]" he argues that "the fraud claim is

properly based on then-present facts." (*See id*. (emphasis added)).

Defendant replies that "these alleged statements are not material, and they still concern non-binding, future events (i.e., the sale of the Company)." (*Id*.). Further, Defendant contends that Defendant's alleged misrepresentations and Plaintiff's resignation occurred before the letter of intent ("LOI") issued on March 22, 2022—which this Court "already held that Plaintiff could not rely on . . . because it was not binding or guaranteed to come to pass." (*Id*. (citing Op. at 12, n.6)). In other words, Defendant argues, "if Plaintiff could not rely upon a LOI about a future sale to maintain his fraud claims, it strains logic that Plaintiff could rely upon preliminary discussions and negotiations regarding a future sale that took place prior to the LOI to maintain his fraud claims." (*Id*. at 5 (collecting cases)).

Under New Jersey common law, "[m]aterial information is 'information that would be important to a reasonable investor in making his or her investment decisions.'" *Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*, No. 11-5550, 2012 WL 13034154, at *4 (D.N.J. July 12, 2012) (quoting *In re Lucent Tech., Inc. Secs. Litig.*, 217 F. Supp. 2d 529, 543 (D.N.J. 2002)). "The Third Circuit has cautioned that '[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law.'" *Id*. (quoting *In re Craftmatic Secs. Litig.*, 890 F.2d 628, 641 (3d Cir. 1990)). To be sure, Defendant correctly identifies that "negotiations . . . in their infancy" may be immaterial. *Mill Bridge V, Inc.*, 2010 WL 5186078, at *11. However, "[w]hether merger discussions in any particular case are material . . . depends on the facts." *Basic v. Levinson*, 485 U.S. 224, 239 (1988). At this early stage of the litigation, the Court does not see fit to determine whether Defendant engaged in sufficiently-material negotiations regarding a potential sale of the Company. *Lord Abbett Mun. Income Fund, Inc.*, 2012 WL 13034154, at *6 ("The Court

further notes that *Mill Bridge . . .* addressed . . . plaintiff['s] claims in the context of [a] motion[ ] for summary judgment pursuant to Federal Rule of Civil Procedure 56, not a motion to dismiss pursuant to Rule 12(b)(6). On the instant motion, this Court must determine whether Plaintiff has sufficiently pled materiality, not whether Plaintiff has ultimately proven its case."); *see In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal."). The Court will therefore focus its analysis on the reliance-related elements of Plaintiff's common law fraud claim.

***Intention that the Other Person Will Rely***. Defendant argues that Plaintiff has inadequately pled that Defendant intended for Plaintiff to rely on any alleged misrepresentation. (*See* Mov. Br. at 19–21). This Court previously held that Plaintiff failed to sufficiently do the same, because Plaintiff did not allege (i) that he ever told Defendant that he was considering resigning; (ii) that Plaintiff and Defendant ever had any conversation regarding whether Plaintiff would be entitled to a deal bonus if he remained at the Company and if the Company was ever sold; or (iii) that Plaintiff was entitled to or promised he would receive a deal bonus if he had not resigned. (*See* Op. at 12–13). Defendant argues that "[Plaintiff] still fails to allege that [Defendant] made any statements with the intent that he would rely on them" and has failed to remedy the errors that this Court previously identified. (Mov. Br. at 19). Specifically, Defendant notes that Plaintiff does not allege (i) that Plaintiff "informed [Defendant] of his intent to resign"; (ii) that Defendant knew that Plaintiff's "employment decisions hinged on any alleged representations"; or (iii) that Defendant "was aware of [Plaintiff's] expectations regarding a deal bonus or that any such bonus was discussed." (*Id*. at 19–20).

In response, Plaintiff contends that Defendant did, indeed, "intend[ ] [for Plaintiff] to rely

on his misrepresentations and then force him from the Company so that Defendant's bonus would be increased in a few months' time." (Opp. Br. at 17). Moreover, Plaintiff argues that he pled the following facts showing that he was entitled to a deal bonus: (i) following a June 2021 sale, Plaintiff was awarded a deal bonus of $452,641.00, (*id*. ¶ 21); (ii) the Company "created a term sheet with bonus payouts for executives[,]" and "[a]ccording to one of the term sheets, Plaintiff was to receive a bonus payout of $496,499.00 with the closing of the contemplated sale[,]" (*id*. ¶¶ 74–75); and (iii) Plaintiff was entitled to a "significant bonus payment" as the Chief Revenue Officer "by way of his employment contract[,]" (*id*. ¶ 90).[13]

Defendant argues in reply that Plaintiff's July 13, 2021 promotion letter did not "contractually entitle[ ] him to a deal bonus upon the sale of the company[,]" but rather states that he would be "granted a number of stock options . . . estimated to result in a total target value of $300,000 net exercise price, upon a 'Sale of the Company[.]'" (Reply Br. at 5–6 (citing Exhibit A at 4 (ECF Pagination))). "Put another way," Defendant contends, "there is nothing in Kuhn's promotion letter stating that he would receive a 'payment' or 'payout' if the Company was sold." (*Id*. at 6).

Defendant is correct that, in his Amended Complaint, Plaintiff does not "allege that Plaintiff ever told Defendant that he was considering resigning or that Plaintiff and Defendant ever had any discussion regarding whether Plaintiff would be entitled to a deal bonus if he remained at the Company." (Op. at 12–13; *see generally* Am. Compl.). Neither, as Defendant says, does Plaintiff allege any facts to suggest that Defendant knew that Plaintiff's "employment decisions hinged on any alleged representations" or that Defendant "was aware of [Plaintiff's] expectations

---

[13]   Defendant argues that, if "Plaintiff now claims that Defendant and the Company breached the July 13, 2021 promotion letter, Plaintiff's fraud claims are subsumed and precluded by the economic loss doctrine." (Reply Br. at 7 n.3 (citing *SRC Constr. Corp. v. Art. CityHous. Auth.*, 935 F.Supp.2d 796, 801 (D.N.J. 2013)). To the extent Plaintiff makes any such allegation, he shall amend his pleading accordingly.

regarding a deal bonus." (Mov. Br. at 18–19; *see generally* Am. Compl.). In other words, the Amended Complaint fails to correct pleading errors this Court identified when it previously determined that Plaintiff had not "allege[d] that Defendant made . . . statements with the intent that Plaintiff would rely on them." (Op. at 12).

As for whether the Amended Complaint now "allege[s] any facts showing Plaintiff was entitled to or promised he would receive a deal bonus . . . if he had not resigned" prior to the 2022 sale, this Court previously rejected Plaintiff's contention that "the 'deal bonus'" he received following the June 2021 sale of the Healthgrades Marketplace division evidenced any such fact. (*See id*. at 12–13; *compare* Compl. ¶ 21, *with* Am. Compl. ¶ 21). Moreover, none of Plaintiff's new allegations show that he was "entitled" to a deal bonus—and they particularly do not show that he was ever "promised" the same. (*Id*.). Although Plaintiff now appears to argue that he was contractually entitled to such a bonus upon a sale of the Company, (*see* Am. Compl. ¶ 90), Defendant correctly identifies that Plaintiff's July 13, 2021 promotion letter, (*see generally* Exhibit A; Exhibit 1), contains "no guaranteed cash payout or deal bonus provision." (Mov. Br. at 20).[14] To the contrary, the letter entitles Plaintiff to "a number of ***stock options*** under the Healthgrades Holding Company, Inc. Amended and Restated 2019 Management Equity Plan." (*See* Exhibit A at 4 (ECF Pagination) (emphasis added)); *see Adler Eng'rs, Inc. v. Dranoff Props., Inc.*, No. 14-0921, 2014 WL 5475189, at *3 (D.N.J. Oct. 29, 2014) ("[G]enerally where the terms of the authentic document Plaintiff[ ] rel[ies] on contradict[s] [his] own assertions, the Court will consider both to determine the sufficiency of the allegations" at the motion to dismiss stage.).[15]

---

[14]    As noted above, the Court properly considers Plaintiff's July 13, 2021 promotion letter at the motion to dismiss stage as a "document integral to or explicitly relied upon in the complaint." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

[15]    In fact, the Court notes that the Amended Complaint and Plaintiff's Opposition are quite opaque on this point. In the Amended Complaint, Plaintiff occasionally refers to a "deal bonus," other times mentions his "stock options," and still in other places claims that a "sale would have triggered Plaintiff's stock options ***and*** bonus"—seeming to

Neither does Plaintiff's allegation that "the Company created a term sheet with bonus payouts for executives" cure the pleading issues identified by this Court, particularly given the other deficiencies identified: Plaintiff does not allege whether he knew about the existence of the term sheet (let alone its contents) prior to submitting his resignation, whether he and Defendant ever discussed the term sheet or its contents, or whether other term sheets were created which showed Plaintiff receiving different "deal bonuses" or no deal bonus at all.  Nor may the Court reasonably infer any such facts based on Plaintiff's other allegations (e.g., Plaintiff alleges that "**one of** the term sheets" showed him receiving a bonus).  (*See* Am. Compl. ¶ 74–75 (emphasis added)).

Accordingly, the Amended Complaint fails to remedy the errors previously outlined by this Court and "contains no allegations that Defendant['s] statements were intended to induce Plaintiff to take any action." *Young*, 2025 WL 2234915, at *7 (citing *Trusted Transportation Sols., LLC v. Guarantee Ins. Co.*, No. 16-7094, 2018 WL 2926167, at *6 (D.N.J. June 11, 2018) (dismissing claim for fraud because "[The p]laintiff does not allege how, if at all, any of the alleged misrepresentations or omissions were intended to induce [the p]laintiff to act")).[16]  Thus, the Amended Complaint "fails to adequately plead intent to induce reliance, a necessary element of common law fraud." *Young*, 2025 WL 2234915, at *7 (citing *Morisseau v. Borough of N. Arlington*, 16-837, 2018 WL 1522731, at *18 (D.N.J. Mar. 28, 2018) (holding that plaintiff must allege the misstatements were "made with the intent that [the p]laintiff rely on [them]")); *see*

---

suggest that the two are separate and distinct.  (*Compare* Am. Compl. ¶ 44–45, *with id*. ¶ 27, *and id*. ¶ 96 (emphasis added)).  And yet, when Defendant correctly identified that Plaintiff's contract entitled him to stock options and did ***not*** entitle him to any "cash payout or deal bonus" upon a sale of the company, (*see* Mov. Br. at 19–20), Plaintiff accused Defendant of "lying" because—confusingly—Plaintiff "was granted a number of stock options[,]" (Opp. Br. at 12).

[16]     Plaintiff's sole allegation that "Defendant intended to drive Plaintiff out of the Company so that Defendant could avoid paying Plaintiff a deal bonus" is conclusory and insufficient to demonstrate that Defendant made any misstatement with the intention that Plaintiff take an ***action*** in reliance upon it, as this Court previously held.  (Am. Compl. ¶¶ 89–90).

*also Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at \*9 (D.N.J. May 31, 2017) ("[The p]laintiffs fail to allege any facts in support of [the d]efendants' knowledge or belief of their falsity, or that [the d]efendants intended [the p]laintiffs to rely on that falsity. Consequently, [the p]laintiffs fail to properly plead a claim for common law fraud under New [J]ersey law.").

***Reasonable Reliance***.   Finally, Defendant argues that "[t]he allegations set forth in the Amended Complaint show that Kuhn's reliance (if any) on Willford's statements was not reasonable." (Mov. Br. at 22).  Defendant points to Plaintiff's allegations that Plaintiff was a long-tenured executive in a senior leadership role with the Company; he had previously participated in mergers and divestitures with the Company; he was aware of rumors regarding a potential fire sale of the Company; and he was aware that several members of management had quit as a result of the Company's direction." (Mov. Br. at 22 (citing Am. Compl. ¶¶ 74–75)).  Plaintiff accordingly "questioned [Defendant] multiple times about the Company's direction and whether [it] was being positioned for a sale." (*Id.*).  Defendant thus argues that, based on Plaintiff's "own allegations[,]" his "contention that he relied on [Defendant's] statements is completely unreasonable." (*Id.*).  In opposition, Plaintiff argues that "Defendant ignores the plain allegations of the Amended Complaint[,]" which Plaintiff argues "clearly alleges his reasonable reliance on Defendant's statements." (Opp. Br. at 11–12 (citing Am. Compl. ¶¶ 89–90)).

"A party reasonably relies on a misrepresentation where the 'facts to the contrary were not obvious or did not provide a warning,' or where the relying party did not reasonably 'pursue further investigation' that would have revealed 'the falsity of the representation.'" *Arcand*, 673 F. Supp. 2d at 305–06 (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 189 N.J. Super. 347, 355, 460 A.2d 161 (App. Div. 1983), *rev'd in part on other grounds,* 477 A.2d 1224 (N.J. 1984)).

21

Specifically, "[a] party cannot reasonably rely on a representation when that 'party knows [the] representation is untrue.'" *Young*, 2025 WL 2234915, at \*7 (quoting *Jatras v. Bank of Am. Corp.*, No. 09-3107, 2010 WL 5418912, at \*5 (D.N.J. Dec. 23, 2010)).

Here, as in *Young*, despite Defendant's repeated assurances that the Company was "not going to be sold" and that there were "no discussions concerning any sale[,]" Plaintiff continued to challenge these claims—to the extent that Defendant "warned Plaintiff not to raise the subject [of a sale] with him again." (Am. Compl. ¶ 73; *see also id*. ¶¶ 43–47, 54–56, 66, 72–73; *id*. ¶ 52 ("From December 2021 through March 2022, Plaintiff and Defendant had a series of very terse discussions around the direction Defendant was taking the Company."); *see also Young*, 2025 WL 2234915, at \*7 ("[D]espite [Defendant's] repeated assurances . . . Plaintiff directly challenged [his] claim."). Plaintiff himself admits that "he had heard speculation about . . . a sale" and, based on his "25 years of experience in the healthcare technology industry[,]" he believed that "the Company's operational decisions suggested a sale may occur." (*Id*. ¶ 1, 55). In other words, "Plaintiff's own allegations establish his disbelief in Defendant's misrepresentations." *Young*, 2025 WL 2234915, at \*7.

Moreover, even if the Court were inclined to find the reasonableness of Plaintiff's reliance a question more appropriately considered on a motion for summary judgment, as Plaintiff urges it do, the Court again notes that Plaintiff "fails to adequately plead intent to induce reliance, a necessary element of common law fraud." *Id*. This failure independently requires dismissal of Plaintiff's claims for common law fraud and fraudulent misrepresentation. *See, e.g*., *Morisseau*, 2018 WL 1522731 at \*18; *Neuss*, 2017 WL 2367056 at \*9.

### C.   Fraudulent Concealment and Fraudulent Omission

Plaintiff's Complaint further fails to state a claim for fraudulent concealment or fraudulent

22

omission under New Jersey law.  "To state a claim for fraudulent concealment under New Jersey law, a plaintiff must allege: (1) a legal duty to disclose (2) a material fact (3) that plaintiff could not discover without defendant disclosing it; (4) that defendant intentionally failed to disclose that fact; and (5) that plaintiff was harmed by relying on the non-disclosure."  *Polhill v. FedEx Ground Package Sys.*, 604 F. App'x 104, 108 n.2 (3d Cir. 2015) (citing *Rosenblit v. Zimmerman*, 766 A.2d 749, 757–58 (N.J. 2001)); *see also United Cap. Funding Grp., LLC v. Remarkable Foods, LLC*, No. 21-3291, 2023 WL 5722910, at *4 (D.N.J. Sept. 5, 2023).  Similarly, "[t]o state a fraudulent omission claim, plaintiffs generally must establish that the defendant had a duty to disclose the omitted information."  *Cohen v. Subaru of Am., Inc.*, No. 20-8442, 2022 WL 721307, at *19 (D.N.J. Mar. 10, 2022) (citing *Clark v. Prudential Ins. Co. of Am.*, 289 F.R.D. 144, 184 (D.N.J. 2013)); *see also Ramirez v. World Mission Soc'y, Church of God*, No. 14-1708, 2024 WL 1366445, at *5 (D.N.J. Apr. 1, 2024) ("In New Jersey, fraudulent omission claims require the defendant to have a duty to disclose the omitted information." (citations omitted)).  "Three general classes of transactions give rise to a duty to disclose": (i) "fiduciary relationships such as attorney and client"; (ii) "where, because of the nature of the transaction or the parties' position toward each other, 'trust and confidence ... is necessarily implied'"; and (iii) "where contracts or transactions are 'intrinsically fiduciary' because of their 'essential nature' and thus 'necessarily call [] for perfect good faith and full disclosure, without regard to any particular intention of the parties.'" *Ramirez*, 2024 WL 1366445, at *5 (alterations in original) (citation omitted).

One common element of both causes of action is that the plaintiff must allege that the defendant had a duty to disclose.  In its previous Opinion, this Court held that Plaintiff's Complaint did not allege any facts showing Defendant owed Plaintiff a duty to disclose information regarding the Company's alleged future plan to be sold to WebMD, nor did it allege any facts regarding a

23

relationship between Plaintiff and Defendant that would have created such a duty.  (Op. at 14). Therefore, the Court found that Plaintiff's Complaint failed to adequately state a claim for fraudulent concealment or fraudulent omission under New Jersey law.  *See, e.g.*, *Pushkin v. Nussbaum*, No. 12-0324, 2017 WL 1591863, at *8 (D.N.J. Apr. 28, 2017), *report and recommendation adopted*, 2018 WL 500145 (D.N.J. Jan. 19, 2018) ("Plaintiff completely fails to allege the essential elements of a claim for fraud such that he does not meet the pleading requirement of Fed. R. Civ. P. 8, let alone the more heightened pleading standard of Rule 9(b)."). Aside from Plaintiff's conclusory allegations that "Defendant had a duty to not mislead or misrepresent the state of affairs[,]" (Am. Compl. ¶¶ 97 & 109), and that "trust and confidence [was] necessarily implied such that it called for good faith and disclosure by Defendant[,]" (*id*. ¶ 115), Plaintiff has offered no allegations to support a finding that Defendant had any duty to disclose.[17]  The Court therefore rests on its previous ruling that Plaintiff failed to adequately plead an actionable claim of either fraudulent concealment or fraudulent omission.

### D.      Rule 9(b)

For the reasons articulated *supra*, the Court holds that Plaintiff has failed to state a claim for common law fraud, fraudulent misrepresentation, fraudulent concealment, or fraudulent omission under New Jersey law.  Moreover, irrespective of whether Alabama or New Jersey law applies, Plaintiff's Amended Complaint again fails to meet Rule 9(b)'s heightened pleading requirements for fraud claims.  (*See* Op. at 9 (holding that Plaintiff's Complaint failed "to allege with sufficient particularity facts relating to the 'when' and 'where' of the allegedly fraudulent statements.")).  The Court emphasized in its prior Opinion that Plaintiff did not allege "when after the December 2021 and Q4 2021 Board of Directors meetings he spoke with Defendant or where

---

[17]      The Court reiterates its conclusion that *McConkey v. AON Corporation* is inapposite to the facts of the instant matter.  (*See* Op. at 13 n.7 (citing *McConkey*, 804 A.2d 572 (N.J. Super. Ct. App. Div. 2004)).

these interactions with Defendant took place—whether they occurred in person, virtually, or otherwise, and whether they occurred in New Jersey, Alabama, or elsewhere." (*See id.*). Defendant argues that, although the "Amended Complaint attempts to address these deficiencies by identifying three dates (December 10, 2021, January 12, 2022, and March 1, 2022) on which he allegedly asked Willford whether the Company was being sold[,]" the Amended Complaint remains "insufficient under Rule 9(b), particularly because the 'where' remains missing." (Mov. Br. at 12–13 (citing Am. Compl. ¶¶ 41–47, 54–56, 72–73)). Defendant contends the following:

> While the Amended Complaint alleges that the December 10, 2021 conversation occurred by telephone and that Willford [Defendant] was in New Jersey at the time, [Plaintiff] fails to allege where Kuhn [Plaintiff] was located. Was Kuhn [Plaintiff] in New Jersey, Alabama, or elsewhere? The Amended Complaint is silent. For the January 12 and March 1, 2022 calls, Kuhn [Plaintiff] again alleges they occurred by telephone but omits any location for either party.

(*Id.* at 13 (Am. Compl. ¶¶ 41–47, 54–56, 72–73)). In response, Plaintiff argues that "Rule 9(b) does not require a plaintiff to definitively state the location of [a] fraudulent speaker[,]" and that "[s]uch requirement would be near impossible when the parties rely on remote communications." (Reply Br. at 8).

As noted above, Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1398 (E.D. Pa. 1984) (finding plaintiff sufficiently pled a claim based on New Jersey common law fraud where "various misrepresentations and omissions are described [in exacting detail], accompanied by the substance of the statements, the identity of the speaker and why they are alleged to be fraudulent."). To be sure, Plaintiff newly alleges that he asked Defendant if the Company was going to be sold on three separate occasions, each over the telephone: December 10, 2021, June 12, 2022, and March 1, 2022. (*See* Am. Compl. ¶¶ 41–47, 54–56, & 72–73). As described above, however, Plaintiff does

25

not allege the location of either speaker—himself or Defendant—for the June 12, 2022, and March 1, 2022 phone calls, (*see* Am. Compl. ¶¶ 54–56 & 72–73), or his own location for the December 10, 2021 call, (*see* Am. Compl. ¶¶ 41–47).  Even so, Plaintiff correctly argues that, while "[i]t is certainly true that allegations of 'date, place, or time' fulfill" the functions of Rule 9(b), "nothing in the [R]ule requires them." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984); (*see* Opp. Br. at 7–8).  Indeed, "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*; *see also Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, No. 91-5433, 1992 WL 249880, at *5 (D.N.J. Sept. 25, 1992) (finding plaintiff's allegations sufficient under the *Seville* standard where they "describe[d] the content of alleged misrepresentations and, by identifying specific individuals or particular circumstances, further identif[ied] the alleged misrepresentations at issue.").

Be that as it may, what troubles the Court is that the Amended Complaint does not inject such precision.  In fact, the Court finds itself frankly confused about what information, exactly, Plaintiff alleges that Defendant misrepresented or omitted.  Did Defendant misrepresent that "there [were] no discussions concerning any sale of the Company" ***internally***?  Or, did Defendant misrepresent that the Company was not "engaged in any negotiations concerning a sale of the Company" ***externally***?  (*See* Am. Compl. ¶¶ 47, 56–57, 72–73).[18]  If the former, Plaintiff's allegations read to this Court as particularly flawed, given that Plaintiff claims he first approached Defendant with his concerns regarding the Company's direction on December 10, 2021, following an internal meeting "***concerning a sale of the Company***," which Plaintiff himself appears to have

---

[18]    Perhaps Plaintiff meant to allege both.  That the Court cannot tell, however, does not support a conclusion that Plaintiff adequately "set[ ] forth the nature of the alleged misrepresentations" or "describe[d] the nature and subject of the alleged misrepresentations." *Seville*, 742 F.2d at 791.

attended. (Am. Compl. ¶ 38 (emphasis added)).[19] More confusingly still, Plaintiff alleges that Defendant's June 12, 2022 statement that the Company was not "engaged in *negotiations*" to sell the Company was false because, at the time of this conversation, Defendant was "engaged in *internal* discussions to sell the Company"—discussions, presumably, like the December 2021 meeting that Plaintiff participated in. (*Id*. ¶ 50, 57 (emphasis added)).

Accordingly, this Court cannot conclude that Rule 9(b)'s purpose of putting Defendant on notice of the claims against him has been served, as Plaintiff has insufficiently "set[ ] forth the nature of the alleged misrepresentations" and "each allegation of fraud" does not "adequately describe the nature and subject of the alleged misrepresentation[ ]." *Seville*, 742 F.2d at 791.

In sum, the Court holds both (i) that Plaintiff fails to plausibly state a fraud claim under New Jersey law for common law fraud, fraudulent misrepresentation, fraudulent concealment, or fraudulent omission; and (ii) that, irrespective of whether New Jersey or Alabama law applies, Plaintiff fails to meet the requirements of Rule 9(b).

### d.    Leave to Amend

"[I]f a complaint is vulnerable to [Federal Rule of Civil Procedure] 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 256 n.14 (3d Cir. 2010) (quoting *Phillips*, 515 F.3d at 236) (citation omitted). This rule applies "even if the plaintiff does not seek leave to amend." *Id.* (citing *Phillips*, 515 F.3d at 245 (citation omitted)). Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Id.* (quoting *In re Burlington Coat Factory*, 114 F.3d at 1434).

---

[19]    To the extent that Plaintiff did not intend to allege his attendance at the December 2021 meeting "concerning a sale of the Company," despite significant indication to the contrary, the Court notes that any uncertainty on this score further supports its conclusion that Plaintiff has failed to inject precision into his allegations of fraud. (*See* Am. Compl. ¶¶ 38–41).

It seems to the Court that Plaintiff could have provided sufficient detail regarding the exact substance and nature of the alleged misrepresentations at issue, the location or locations of his own reliance on those misrepresentations, and the precise nature of his expectations upon a sale of the Company—information which would bear on the Court's analyses under both Rule 12(b)(6) and Rule 9(b). Because Plaintiff may well be able to provide this clarifying information, the Court finds that amendment would not be futile at this stage. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) ("An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."). The Court accordingly grants Plaintiff one final chance to amend his pleading. *See In re Burlington Coat Factory*, 114 F.3d at 1435 ("[B]ecause we are hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings, we believe that the plaintiffs should be afforded an additional, albeit final opportunity, to conform the pleadings to Rule 9(b)" (quoting *Ross v. A.H. Robins Co.,* 607 F.2d 545, 547 (2nd Cir. 1979))). Should Plaintiff fail to correct the errors identified herein, the Court will be inclined to dismiss this matter with prejudice.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss, (D.E. No. 40), is **GRANTED**, and Plaintiff's Amended Complaint, (D.E. No. 38), is **DISMISSED** *without prejudice*. Within thirty (30) days of the date of this Opinion, Plaintiff may file his amended complaint. An appropriate Order follows.

**Dated: March 31, 2026**                    */s/ Esther Salas*
                                              **Esther Salas, U.S.D.J.**

28